**RE:**   Job Announcement No. OST-04-001-NG (Amended)
Director, Office of Economic and Strategic Analysis, ES-301

# JOHN VARICK WELLS

voice (home): ████████
e-mail (home)████████         fax (home): ████████
e-mail (work):  jack.wells@bts.gov      voice (work):   (202) 366-9224
fax (work):   (202) 366-3640
cell: ████████

SSN: ████         DOB: October 22, 1948      Veterans preference:  none
Reinstatement eligibility:  none    Citizenship: United States of America
Highest Federal civilian grades held: GS-15 (career); SES (non-career); SL (career)

## Current Position

**2001 – present**

### Chief Economist, Bureau of Transportation Statistics
~~Room 2402 (E-2),~~ 400 7th St., S.W., Washington, D.C. 20590
Supervisor:  Richard Kowalewski, (202) 366-9777 [you may contact him]
May 2001 - present
40 hours per week      **Salary:  $142,046, Senior Level**

Oversee economic analysis within the Bureau of Transportation Statistics, provide advice to the Director of BTS and to others within the Department of Transportation on economic issues, and take responsibility for other special projects.

- Oversee and advise the Director on BTS' economic research projects, including work on international economic competitiveness, transportation satellite accounts, capital stock accounts, productivity of transportation, and indicators of transportation economic activity.
- Carry out special assignments, including serving as Acting Associate Director for Information Systems, chairing Departmental Task Force on Data Needs in Reauthorization, serving as editor of the *Journal of Transportation and Statistics*, and planning BTS' American Freight Data Program.
- Advise the Director on a wide range of executive issues, including outreach and communications, congressional relations, reauthorization strategy, project planning, performance appraisal design, and strategic planning.

## Fields of Expertise

Transportation economics (including safety, competition, and infrastructure issues)
Industrial organization                Regulatory economics
Antitrust economics                  Transportation labor economics
Public works and infrastructure economics   Economics of science and technology

## Education

1978   Ph.D., Economics, Yale University, New Haven, Ct.
Dissertation title:  The Origins of the Computer Industry – A Case Study in Radical Technological Change
1970   B.A., Economics (*cum laude*), Harvard University, Cambridge, Mass.
1966   H.S. diploma, Mt. Pleasant Senior High School, Wilmington, Del.

## Previous Work Experience

**2000 - 2001**     **Deputy Administrator, Federal Railroad Administration**
1120 Vermont Ave., N.W., Washington, D.C.  20590
Supervisor:  Jolene Molitoris, (954) 426-8791, x348
May, 2000 – January, 2001
40 hours per week        Salary:  $121,264, non-career SES

- I was normally responsible for the day-to-day administration of an agency of 750 employees, and acted as Administrator during the frequent travels by the Administrator.
- In the face of a threat of congressional termination of a key grade-crossing safety rulemaking, I developed a comprehensive strategy to prevent this from happening. I worked with community groups to address their concerns about the rulemaking, met with key Members of Congress to identify and respond to their concerns, directed agency resources to develop data and analyses to support FRA's arguments for the rulemaking, worked with supporters of the rulemaking to make their support more visible, changed the way we communicated about the proposed rule so as to emphasize the flexibility inherent in the proposal, and testified at a hearing to press the case for the rulemaking and to respond directly to criticisms from opponents.
- I led the implementation of the Railroad Rehabilitation and Improvement Financing program, which I had helped to write while working as a staff member of the House Transportation and Infrastructure Committee.  Implementation required overcoming persistent hostility from the Office of Management and Budget and creatively addressing OMB's concerns about financing risk.
- I reviewed the agency's cost-benefit analyses to ensure that proposed rulemakings were adequately supported.
- I reviewed the economic analysis underlying proposed rulemakings by the Surface Transportation Board on railroad mergers and took a lead role in drafting the Department of Transportation's comments on these proposed rulemakings.
- I improved training by requiring more systematic training plans, reduced unfilled vacancies by delegating hiring responsibilities to regional managers and by recruiting in anticipation of vacancies, and enhanced diversity by reviving the agency's inspector trainee program.
- I raised the morale of field office staff by making frequent visits to field offices and regional conferences and by drawing on my own personal experiences to reemphasize the importance of the work that the field office staff do.

**2000**     **Consultant, Federal Railroad Administration**
1120 Vermont Ave., N.W., Washington, D.C.  20590
Supervisor:  Jolene Molitoris, (954) 426-8791, x348
March, 2000 – May, 2000
40 hours per week        Salary:  $121,264

Responsible for analyzing and recommending changes in human resource management practices, using cost-benefit analysis to prioritize rulemaking, and developing communication strategies.



**1999 – 2000**   **Senior Democratic Professional Staff Member,**
**Subcommittee on Ground Transportation**
**Committee on Transportation and Infrastructure**
**U.S. House of Representatives**
2163 Rayburn House Office Bldg., Washington, D.C.  20515
Supervisor:  David Heymsfeld, (202) 225-4472
January 1999 – March 2000
40 hours per week          Salary:  $102,209 - $112,243

Responsible for coordinating policy on railroad issues for 212 Democratic Members of
the U.S. House of Representatives.  Key accomplishments and responsibilities include:
- Drafting two comprehensive railroad safety bills;
- Coordinating strategy within the Democratic caucus of the Committee and the House
  of Representatives on key legislative initiatives such as rail safety reauthorization
  and Surface Transportation Board reauthorization;
- Reviewing proposed railroad mergers to assess their potential anticompetitive
  effects;
- Using econometric ridership models to assess the potential for new high-speed rail
  passenger and commuter rail services;
- Conducting oversight on many rail-related issues, including safety effects of railroad
  operator fatigue, harassment and intimidation of rail employees, track safety
  problems, passenger equipment safety issues, implementation of major rail mergers,
  implementation of new high-speed rail and commuter rail operations, Amtrak
  financial problems, and captive shipper problems;
- Maintaining liaison with key agencies (FRA, STB, RRB, NMB, ARC), Amtrak,
  freight and commuter railroads, rail labor, academic economic researchers, and the
  news media; and
- Serving as a policy resource on railroad issues for Democratic Members of the
  House of Representatives as well as for Senate staffs.

**1995 – 1999**   **Democratic Staff Director, Subcommittee on Railroads**
**Committee on Transportation and Infrastructure**
**U.S. House of Representatives**
2163 Rayburn House Office Bldg., Washington, D.C.  20515
Supervisor:  David Heymsfeld, (202) 225-4472
January 1995 – January 1999
40 hours per week          Salary:  $88,145 - $102,209

Responsible for coordinating policy on railroad issues for over 200 Democratic Members
of the U.S. House of Representatives.  Key accomplishments and responsibilities include:
- Drafting two comprehensive railroad safety bills as well as numerous amendments to
  other bills;
- Coordinating strategy within the Democratic caucus of the Committee and the House
  of Representatives on key legislative initiatives such as the ICC Termination Act, the
  Amtrak Reform and Accountability Act, prospective rail strike legislation, rail safety
  reauthorization, and Surface Transportation Board reauthorization;
- Reviewing proposed railroad mergers to assess their potential anticompetitive
  effects;
- Using econometric ridership models to assess the potential for new high-speed rail
  passenger and commuter rail services;
- Organizing successful coalitions of Democrats and moderate Republicans to win key
  votes on labor protection for freight railroad and Amtrak employees, Amtrak liability
  protection, and Amtrak contracting-out issues;

- Developing innovative credit risk financing mechanism as part of bipartisan revision of Title V short line infrastructure funding program for TEA-21 legislation;
- Conducting oversight on many rail-related issues, including effects of railroad operator fatigue, harassment and intimidation of rail employees, track safety problems, passenger equipment safety issues, implementation of major rail mergers, implementation of new high-speed rail and commuter rail operations, Amtrak financial problems, captive shipper problems, and grain car shortages;
- Maintaining liaison with key agencies (FRA, STB, RRB, NMB, ARC), Amtrak, freight and commuter railroads, rail labor, academic economic researchers, and the news media; and
- Serving as a policy resource on railroad issues for Democratic Members of the House of Representatives as well as for Senate staffs.

**1993 – 1995     Staff Director, Subcommittee on Investigations and Oversight
Committee on Public Works and Transportation
U.S. House of Representatives**
2163 Rayburn House Office Bldg., Washington, D.C. 20515
Supervisor: Paul Schoellhamer, (202) 973-7912
January 1993 – January 1995
40 hours per week          Salary: $85,000 - $88,145

- Conducted over 20 hearings on a wide range of issues within the jurisdiction of the full committee, including transportation and environmental infrastructure needs, intermodal transportation safety, intelligent transportation systems, implementation of ISTEA planning and funding flexibility provisions, safety problems of foreign air carriers, safety implications of NAFTA implementation, cargo securement on flatbed trucks, fuel oil pipeline ruptures, evasion of motor fuel taxes, implementation of airport passenger facility charges, FEMA's response to natural disasters, Corps of Engineers reorganization, TVA's nuclear power program, and construction delays at the San Diego International Wastewater Treatment Plant;
- Analyzed growth and international trade effects of infrastructure deficits and market potential for innovative financing techniques to remedy those deficits;
- Analyzed cost-effectiveness of intelligent transportation system investments;
- Issued comprehensive reports on Superfund Reauthorization and Transportation and Environmental Infrastructure Needs; and
- Planned oversight agenda; provided leadership to a staff of nine (including conceptualizing and focusing oversight issues, coaching staff on investigatory and economic research methods, and ensuring high quality standards in reports and other communications); provided support to Members and senior staff; coordinated with Members' staffs, agency officials, and interest groups; drew upon resources of economic research community; and communicated with news media.

**1979 – 1993     U.S. General Accounting Office**
          **1991 – 1993     Supervisory GAO Evaluator (GS-15), Transportation Issues**
          441 G St., N.W., Washington, D.C. 20548
          Supervisor: Kenneth M. Mead, (202) 366-1959
          October 1991 – January 1993
          40 hours per week          Salary: $66,095 - $71,123, GS-15

Directed preparation of five reports and two testimonies on airline competition (especially the effects of computer reservation systems), effects of changing foreign ownership restrictions on control of U.S. airlines, economics of high-speed rail development, enhancing the cost-effectiveness of highway infrastructure investment, and changes in Amtrak's cost structure. Responded in a bipartisan fashion to requests from

4

both Democratic and Republican Members of Congress. Provided leadership to a staff of six (including conceptualizing research projects, coaching staff on economic research methods, focusing and developing GAO's message, and ensuring high quality standards); planned research and oversight agenda; consulted with Congressional staff; maintained liaison with agency, industry, labor, and other interest group officials; drew upon resources of economic research community; provided support and economic counsel to senior GAO officials; provided advice to colleagues on economic research techniques; coordinated with other GAO offices; and explained GAO's results to the news media.

1985 – 1991    **Senior Transportation Economist**
441 G St., N.W., Washington, D.C. 20548
Supervisor: JayEtta Hecker, (202) 512-4128
April 1985 – October 1991
40 hours per week        Salary: $40,105 - $61,650, GS-13, 14

Prepared or directed 17 reports and testimonies on a wide range of transportation economics issues, including the effects of deregulation on the airline, trucking, and railroad industries; airport finance, aviation noise policy, international aviation liability policy, potential for predatory pricing in the trucking industry; limitations to competition in the airline industry; and the costs of cabotage restrictions in the domestic offshore maritime industry. Led econometric study of effects of entry barriers on the competitiveness of the U.S. airline industry. Provided support on economic research techniques to colleagues and staff and provided economic counsel to senior GAO officials.

1983 – 1985    **Senior Economist, Office of the Chief Economist**
441 G St., N.W., Washington, D.C. 20548
Supervisor: Lawrence Thompson, (202) 857-8526
October 1983 – April 1985
40 hours per week        Salary: $34,930 - $40,105, GS-13

As one of the four original staff members of GAO's Office of the Chief Economist, provided counsel on economic issues to a wide range of GAO staff and to senior GAO officials. Prepared a series of five reports and one testimony on the impact of gender discrimination in the insurance industry and an econometric analysis of the effect of state regulatory practices on the cost and availability of automobile insurance.

1979 – 1983    **Staff Economist, Regulatory Policy Issue Area**
**and Science and Technology Policy Issue Area**
441 G St., N.W., Washington, D.C. 20548
Supervisor: Mark Nadel, (202) 358-6114
September 1979 – October 1983
40 hours per week        Salary: $23,087 - $34,930, GS-12, 13

Prepared a report on the use of cost-benefit analysis in federal regulatory agencies and a survey of major science and technology policy issues. Directed a study of the effectiveness of the Carter Administration's Domestic Policy Review on Innovation. Provided support on economic research techniques to an interdisciplinary science and technology policy team.



**1975 – 1979    Assistant Professor of Economics, George Mason University**
4400 University Dr., Fairfax, VA 22030
Supervisor: William P. Snavely, (804) 979-4831
September 1975 – June 1979
40 hours per week        Salary: $16,200 - $19,800

Taught courses on antitrust and regulatory economics, industrial organization theory, microeconomic theory, welfare economics, the economics of growth and technological change, and economic history.

**1972 – 1973    Teaching Assistant, Department of Economics, Yale University**
37 Hillhouse Ave., Box 1972 Yale Station, New Haven, CT 06520
Supervisor: Marsha G. Goldfarb, (410) 455-2160
September, 1972 – June 1973
15 hours per week        Salary: $1,800

Taught course on Principles of Economics.

**1968 – 1970    Research Assistant, Harvard Economic Research Project,
            Harvard University**
1583 Massachusetts Ave., Cambridge, MA 02138
Supervisor: Karen R. Polenske, (617) 253-2654
May, 1968 – August, 1970
10 hours per week        Salary: $2,200

Conducted research on new construction technologies for use in multi-regional input-output table.

## Testimony Delivered

"The Role of Locomotive Horns in Grade-Crossing Safety," Testimony before the Subcommittee on Ground Transportation, Committee on Transportation and Infrastructure, U.S. House of Representatives, July 18, 2000.

## Legislation Prepared

106th Congress:   H.R. 2450, the "Railroad Safety Reform Act of 1999" (July 1, 1999).
            H.R. 2666, the "Federal Railroad Safety Enhancement Act of 1999" (July 30, 1999).
            H.R. 3446, the "Surface Transportation Board Reform Act of 1999"
                (November 18, 1999).
105th Congress:   H.R. 2455, the "Railroad Safety Reform Act of 1997" (September 11, 1997).
104th Congress:   H.R. 3578, the "Railroad Safety Reform Act of 1996" (June 5, 1996).

## Publications

"Has Deregulating the Airline Industry Really Succeeded?" *Journal of Pricing Management*, v. 2, no. 1 (Winter, 1991), pp. 41-44.

"A Behavioral Analysis of Technological Change in the Computer Industry, 1930-1950," *Journal of Economic Issues*, v. 20, no.2 (June 1986).


" New Construction Technologies," Chapter 4 in Karen R. Polenske, *et al.*, *State Estimates of Technology, 1963* (Lexington Books, 1974).

## Selected Conference Presentations

"A New Financing Source for Short Line Railroads," Cooperstown Conference XXIII (July 2000).

"High-Speed Rail and Rail Safety Issues," National League of Cities Transportation Infrastructure and Services Steering Committee (June 2000).

"Measuring Safety Right," Harriman Awards Lunch (May 2000).

"Rail Safety: Congressional Perspectives," 41st Annual Forum of the Transportation Research Forum, Washington, D.C. (September 1999).

"Congressional Perspective on Rail Safety Issues," Association of American Railroads Legislative Conference, White Sulphur Springs, W.V. (July 1999).

"What 1998 Meant, and What it Means to 1999," Alliance for Rail Competition Fall Conference and Meeting, Houston, Tex. (November 1998).

"Future of Rail Transportation Policy," AFL-CIO Transportation Trades Department Legislative and Policy Conference, Landsdowne, Va. (August 1998).

"The Role of Short Line Railroads in an Intermodal Transportation System," Keynote Address to the Pacific Region Meeting of the American Short Line and Regional Railroad Association, Reno, Nev. (June 1998).

"ISTEA and the Role of Rail," Cooperstown Conference XX, Cooperstown, N.Y. (July 1997).

"Rail Safety: The Public/Private Partnership – Where to From Here?" Cooperstown Conference XIX, White Sulphur Springs, W.V. (July 1996).

"The Shape and Direction of ICC Sunset Legislation," Western States Railroad Legislative Conference, Colorado Springs, Co. (October 1995).

"Innovation and Entrepreneurship Under Airline Deregulation," 2nd Annual International Conference on Socio-Economics, Washington, D.C. (March 1990).

"Barriers to Entry in the Airline Industry," 69th Annual Meeting of the Transportation Research Board, Washington, D.C. (January 1990).

"Policy Options in the Trucking Insurance Crisis," Annual Meeting of the Transportation Research Forum, Seattle (September 1986).

"A Behavioral Analysis of Technological Change in the Computer Industry, 1930-1950," Annual Meeting of the Association for Evolutionary Economics, New York (December 1985).

"The Economic Effects of Unisex Insurance," Keynote address, Spring Meeting of the Society of Actuaries, Atlanta (April 1984).

"History, Technology, and Public Policy," Second Annual Conference on Public History, Pittsburgh (April 1980).

### Selected GAO Reports

*High-Speed Ground Transportation: Issues Affecting Development in the United States* (GAO/RCED-94-29, November 17, 1993).

*International Aviation: Measures by European Community Could Limit Airlines' Ability to Compete Abroad* (GAO/RCED-93-64, April 26, 1993).

*Airline Competition: Impact of Changing Foreign Investment and Control Limits on U.S. Airlines* (GAO/RCED-93-7, December 9, 1992).

*Amtrak: Information on Amtrak's Operating Expenses* (GAO/RCED-92-177FS, April 23, 1992).

*Computer Reservation Systems: Action Needed to Better Monitor the CRS Industry and Eliminate CRS Biases* (GAO/RCED-92-130, March 20, 1992).

*New Denver Airport: Safety, Construction, Capacity, and Financing Considerations* (GAO/RCED-21-240, September 17, 1991).

*Aviation Noise: Costs of Phasing Out Noisy Aircraft* (GAO/RCED-91-128, July 2, 1991).

*Airline Competition: Effects of Airline Market Concentration and Barriers to Entry on Airfares* (GAO/RCED-91-101, April 26, 1991).

*Airline Competition: Weak Financial Structure Threatens Competition* (GAO/RCED-91-110, April 15, 1991).

*International Aviation: Implications of Ratifying Montreal Aviation Protocol No. 3* (GAO/RCED-91-45, December 3, 1990).

*Airline Competition: Industry Operating and Marketing Practices Limit Market Entry* (GAO-RCED-90-147, August 29, 1990).

*The Jones Act: Impact on Alaska Transportation and U.S. Military Sealift Capability* (GAO/RCED-88-107, September 30, 1988).

*Trucking Deregulation: Proposed Sunset of ICC's Trucking Regulatory Responsibilities* (GAO/RCED-87-107, April 23, 1987).

*Trucking Regulation: Price Competition and Market Structure in the Trucking Industry* (GAO/RCED-87-16, February 27, 1987).

*Auto Insurance: State Regulation Affects Cost and Availability* (GAO/OCE-86-2, August 5, 1986).

*Economic Implications of the Fair Insurance Practices Act* (GAO/OCE-84-1, April 6, 1984).

*Improved Quality, Adequate Resources, and Consistent Oversight Needed if Regulatory Analysis is to Help Control Costs of Regulation* (GAO/PAD-83-6, November 2, 1982).

*Major Science and Technology Issues* (PAD-81-35, January 30, 1981).

## Testimony Prepared

(While I did not deliver this testimony myself, I joined the principal witness at the witness table and shared in responding to questions from the Members of the Committee.)

"Comments on 'Airline Competition Enhancement Act of 1992'" (House Public Works and Transportation Subcommittee on Aviation, June 18, 1992)

"Airline Competition: Industry Competitive and Financial Problems" (Senate Governmental Affairs Subcommittee on Consumer and Environmental Affairs, February 21, 1992)

"Airline Competition: Industry Competitive and Financial Problems" (Senate Commerce Subcommittee on Aviation, September 11, 1991)

"Airline Competition: Pending Legislation Helps to Address Serious Competitive Problems" (House Public Works and Transportation Subcommittee on Aviation, May 15, 1991)

"U.S. Airlines: Weak Financial Structure Threatens Competition" (House Public Works and Transportation Subcommittee on Aviation, February 6, 1991)

"Aviation Noise: A National Policy Is Needed" (House Public Works and Transportation Subcommittee on Aviation, September 27, 1990)

"Airline Competition: Passenger Facility Charges Can Provide an Independent Source of Funding for Airport Expansion and Improvement Projects" (House Public Works and Transportation Subcommittee on Aviation, June 19, 1990)

"International Aviation: Implications of Ratifying the Montreal Aviation Protocols" (Senate Foreign Relations Committee, June 19, 1990)

"Barriers to Entry in the Airline Industry" (Senate Commerce Subcommittee on Aviation, September 20, 1989)

"Competition in the Airline Computerized Reservation System Industry" (House Public Works and Transportation Subcommittee on Aviation, September 14, 1988)

"Budgetary Effects of the Elimination of ICC's Trucking Regulatory Responsibilities" (Senate Appropriations Subcommittee on Transportation, May 13, 1986)

"Predatory Pricing and Antitrust Enforcement in the Trucking Industry" (House Public Works and Transportation Subcommittee on Surface Transportation, November 7, 1985)

"Economic Implications of Unisex Pensions" (Senate Labor and Human Resources Subcommittee on Labor, October 4, 1983)

## Honors and Awards

BTS Director's Award, 2002
GAO Special Recognition for Outstanding Performance (1991)
GAO Meritorious Service Award (1991)
GAO Special Commendation Awards (1988, 1986, and 1985)

## Professional Affiliations

Transportation Research Board
Transportation Research Forum (President, Washington Chapter)
American Economic Association
Industrial Organization Society

## Community and Volunteer Activities

Member, Potomac Boat Club
Member, Victorian Lyric Opera Company

## References

The Honorable Norman Y. Mineta
Secretary of Transportation
(202) 366-1100

Rep. James L. Oberstar
Ranking Democratic Member
Committee on Transportation and Infrastructure
U.S. House of Representatives
(202) 225-6211

Kenneth M. Mead
Inspector General
U.S. Department of Transportation
(202) 366-1959

Frank Mulvey
Democratic Staff Director, Railroads Subcommittee
Committee on Transportation and Infrastructure
House of Representatives
(202) 225-3274

**RE:**    Job Announcement No. OST-04-001-NG (Amended)
Director, Office of Economic and Strategic Analysis, ES-301
John V. Wells, 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

---

# Qualifications Brief

As Chief Economist at the Bureau of Transportation Statistics (BTS), I am the second ranking official in one of the constituent agencies of the U.S. Department of Transportation (DOT), with 132 employees and a budget of $31 million, that collects and analyzes data on all modes of transportation. I have also served as BTS' Acting Associate Director for Information Systems, managing five disparate offices (responsible for information technology, the development of an on-line "virtual" library, publication of statistical compendia and analytical reports, and collection and dissemination of airline and motor carrier data) with 60 employees and a budget of $16 million. I came to BTS from the Federal Railroad Administration (FRA), another DOT agency where I served as Deputy Administrator, responsible for rail safety rulemaking and enforcement, freight railroad development, and Amtrak oversight. FRA has 750 staff located in 43 field offices, with a budget of $1.25 billion (the FRA position was a non-career position which ended with a change in administration). I had previously spent seven years on Capitol Hill directing two subcommittee staffs – one on Investigations and Oversight for the Public Works and Transportation Committee, and one on Railroad Policy. I managed relatively few staff but was at the center of a series of important public policy debates on all aspects of transportation, providing policy analysis to committee chairmen and other Members of Congress, conducting oversight hearings, drafting legislation, developing legislative strategies, and assembling coalitions. Before that I worked for 13 years at the U.S. General Accounting Office (GAO), an independent congressional agency, doing studies and preparing testimony on the economics of science and technology, regulatory and antitrust policy, and transportation economics. I also benefited from GAO's thorough approach to management training, learning the principles of leadership and management and applying those principles to increasingly higher levels of management responsibility, ending as a GS-15 assistant director. I had started my career as an economics professor at George Mason University, but moved into government after four years to become more involved in critical public policy issues.

## A. Managerial Requirements

1. Leading Change: I have led change in every position I have held. When I arrived at BTS, its staff had increasingly come to set their research agendas based on their own interests, rather than on the issues that were critical to policymakers. BTS had become known to some as a "hobby shop." I led a project to refocus the agency's attention on the statutory mandates that the Congress had established. I also identified key congressional priorities to which BTS could contribute, such as improving pipeline safety data. I sought out the chair of the transportation data committee of the American Association of State Highway and Transportation Officials to find ways that BTS' data could be more useful to state transportation departments. I met with congressional staff both to explore

their transportation data needs and to explain the importance of the vital but sometimes unexciting data gathering that BTS does. I successfully pushed to institutionalize this focus by creating a strategic planner position to maintain BTS' focus on congressional mandates, key policymaking interests of the Secretary, and items on the Presidential Management Agenda. I pushed for the publication of a series of state transportation profiles, because I recognized that they would be valuable for members of congress trying to solve transportation problems in their particular states. The strong positive response we received from Members of Congress confirmed that belief. A key element of the President's Management Agenda was "e-government," so I encouraged the improvement of our website to make it easier for citizens to find the transportation data they were looking for. The revised website won two awards. Gradually, the agency is altering its earlier reputation and becoming known as an organization that is customer-driven.

After I had been at BTS for a year, the Office of the Secretary conducted a "program review" of BTS. The program review concluded that BTS should sharpen its focus, doing fewer things but doing them better (while operating at the same budget level), and seeking congressional approval for eliminating existing congressional mandates. It was a difficult and unwelcome proposal, recommending that we completely eliminate two programs we had worked hard to improve. Nevertheless, it had some positive elements in it, recommending expansions in other programs that I thought were important. I focused on the positive, showing the staff in the programs scheduled for termination how they could find important roles in the other programs scheduled for expansion. I took particular responsibility for two of the programs slated for expansion – freight and economics – and developed plans for expanding our scope of work in those areas. The level of anxiety about the proposed changes has now been dramatically reduced.

In my earlier position as Deputy Administrator at FRA, I noted that FRA staff virtually ignored the railroad noise problem, treating it as outside of our responsibilities, even though it frequently featured in citizen complaints that we received. I directed a change in FRA's approach to this problem, requiring our regional offices to work aggressively with railroads to find solutions that would reduce noise while still allowing railroads to meet their responsibilities to their customers. The result was that FRA came to be viewed as an agency that existed to help ordinary citizens rather than an agency that existed to serve the railroads.

I was brought on as Staff Director on the Subcommittee on Investigations and Oversight by the new chairman of the committee, who wanted a "change agent" to increase the productivity and professionalism of the Subcommittee. The previous staff director had allowed staff to set their own agendas, resulting in an unstructured, poorly coordinated oversight agenda. I developed a more systematic approach to Committee oversight, emphasizing thorough preparation, aggressive questioning, and subsequent follow-up. I initiated a strategic planning approach and clear performance expectations. I persuaded the Subcommittee chairman to hold the first hearing ever on cross-modal transportation safety, examining how safety strategies differed in all the modes of transportation, including two modes – railroads and maritime – over which our committee lacked

jurisdiction. Looking at issues outside the committee's jurisdiction was considered almost unprecedented, but I persuaded the Chairman that we couldn't understand the best approaches to safety enhancement in one mode without understanding how safety was being addressed in all the modes. Later, after a change in committee jurisdiction, when I became minority staff director on the Railroads Subcommittee, there was no expertise on the Committee staff on railroad issues because it had previously been outside the Committee's jurisdiction. I immersed myself in learning how the railroad system worked and what its vulnerabilities were, focusing particularly on railroad safety – the ranking member's key priority. I talked with rail employees and other experts across the country, reviewed technical literature, and studied National Transportation Safety Board reports. Railroad safety legislation had previous been developed in a piecemeal fashion; I developed a comprehensive approach to enhancing rail safety, incorporated it into proposed legislation, and persuaded the Ranking Member of the Committee to introduce it. Several provisions of the bill were later adopted by the Administration.

I went to GAO because I wanted more of an opportunity to contribute to solving public policy problems than I had doing academic research. I led the effort to examine transportation issues from an economic perspective – a decided change from the "deficiency auditing" approach then current. The key question I encouraged auditors to address was not simply whether money was obviously being wasted (i.e., whether costs could be reduced), but whether there was an alternative approach to achieving the program objective that would have a higher payoff than the approach that the agency was pursuing, i.e., a higher ratio of benefits to costs.

In teaching economics at George Mason University, I created three new courses that had never been taught at the University before – Welfare Economics, Growth and Technological Change, and Economic History (winning a National Science Foundation grant to develop the Economic History course). I used the Welfare Economics course to demonstrate the basic theory of how economists evaluate the desirability of a proposed public policy. I used the course on Growth and Technological Change to analyze the key features in the engine of economic development that produce the high income levels we all value. And I used the course on Economic History to provide students with a better understanding of the key features of the economic system we live in by showing how it evolved out of earlier economic institutions which lacked those features.

2. Leading People:  When I arrived at BTS its awards program had become less and less effective in motivating employees. All awards were decided by the two senior managers of the agency, so that employees felt that awards depended more on how much "face time" they had with senior managers than on the quality of their work. I led a task force to create a new awards program that would allow awards to be granted by all supervisory levels within the organization, allowing awards to be granted by those who know the employee's performance best. This increased motivation and morale both among employees, whose performance was more likely to be recognized, and among supervisors, who were more able to reward their employees' performance.

BTS had hired a number of new economists from a wide range of previous employments, and assigned them to several different offices. They didn't know each other and lacked opportunities to learn about each other's skills and expertise. I created a transportation economics seminar to give the agency's economists the opportunity to present the results of their work to their colleagues, receive useful suggestions on their methodology, and gather ideas on how to develop their work in ways that would advance agency missions. The seminar succeeded in building cohesiveness, encouraging increased creativity and collaboration, and focusing the staff's work on key agency missions.

When I had been at BTS about 6 months, an ugly accusation of an inappropriate sexual relationship was lodged against a senior manager. While management tried to deal with the allegation confidentially, rumors about it quickly spread around the agency. The senior management team developed distrust of one another, because some suspected others of spreading these rumors. As someone who generally retained the confidence of all the members of the senior management team, I was able to meliorate this distrust, carefully explaining to each member of the team my understanding of how the others thought about the issue, preserving confidentiality when it was appropriate, but encouraging transparency when it was needed and could contribute to an easing of tensions.

FRA, like many agencies, experienced on-going tension between "headquarters" and "field." Headquarters felt that the field was unresponsive to headquarters' mission priorities, while field thought that headquarters didn't know anything about the real world because they were so wrapped up in political intrigues in Washington. I gave a series of speeches at regional staff conferences that emphasized the recognition that headquarters gave to the safety work that the field employees did, and the high moral purpose of that work. I used examples of difficulties that others had faced in achieving their objectives to encourage them to keep focused on their mission and not to be discouraged by the frustrations that working in a large organization often produces. In these speeches, and in many face-to-face discussions with regional office staff, I emphasized the congruence between the ethical values that the employees brought to their work and the agency's vision, missions, and goals. I spent a lot of time listening during informal gatherings to the problems that the employees experienced in their work.

When I arrived at FRA, 80 percent of its safety inspectors were white males between the ages of 40 and 60. Most of the employees came from the railroad industry, where promotions were generally based on seniority, and not necessarily on merit. The employees therefore were prone to get upset whenever a junior person was promoted rather than a senior person, especially if the junior person was a woman or a minority. The leadership of the Department was known to place great weight on encouraging diversity, so that employees believed that promotions were often based on achieving diversity goals rather than merit. Managers often felt that they were not at liberty to choose the person whom they genuinely believed was the best person for the job. I worked with the managers to encourage them to expand their horizons on the issue of "merit." I talked to them about people who had been promoted in the past when they had been relatively junior, but who had succeeded in their new jobs. I talked to them about

women who had been promoted who had demonstrated that people skills were often more important than technical skills in persuading a railroad to accept a program of safety improvement. I talked to them about minorities who brought with them unique perspectives that enhanced our ability to work with all the communities whose cooperation was necessary to achieve our agency's missions. And then I told them that the decision was theirs, and that I would back them up, whatever decision they made, as long as the person they chose succeeded.

Many of FRA's staff had received their training "on-the-job" in the railroad industry, and had only high school educations. As a result, their writing ability was often inadequate, and they lacked other skills required to meet all of their responsibilities. We had a well-organized training program addressing technical safety knowledge, but virtually no training in the other skills required of agency leaders – writing, public speaking, data gathering and analysis, management, and leadership. We had no training coordinator (a position that had been eliminated as part of the effort to "reinvent government"). I reorganized responsibilities within our human resources office to create a part-time position for a training coordinator, and established new standards for the training plans that employees were required to prepare. The results will take time to manifest themselves, but staff had already begun to recognize the importance of a wider range of skills in preparing themselves for more responsible positions.

When I became Staff Director to the Subcommittee on Investigations and Oversight, the staff had minimal professional credentials and had secured their positions largely through political patronage. The chairman clearly wanted a more professional approach to the Subcommittee's work, but didn't want a wholesale replacement of staff. I replaced one staff person, brought in detailees from other agencies to provide good role models of professionalism, and worked with the staff to coach them on their research, investigatory, and writing skills. I challenged the staff to upgrade their skills by giving them developmental assignments that pushed the envelop of their abilities. One staff person, for example, who had been serving as a secretary and who had never written a research report, had an interest in clean water issues, so I assigned her as co-author on a report on Superfund issues.

At GAO I often used a team approach to conduct research and audit projects, assembling staff from various offices and disciplinary backgrounds – lawyers, economists, actuaries, survey research specialists, financial analysts, and accountants. As the team leader, with a background (in economics) different from that of most members of my team, I showed staff how to bridge the gaps in experience and perspective to make each staff person understand the importance of the perspectives of the others, so that the resulting report would represent the best thinking of all the different kinds of expertise represented on the team.

3. Results Driven: When I arrived at BTS, our Office of Outreach was rudderless. It had no strategic plan, and "outreach" consisted largely of the director's desultory contacts with people in various organizations that used our work. The office director had drafted a "strategic plan," but it consisted of nothing more than a laundry list of a few worthwhile

things to do to make our work better known. It was based on no analysis of who our customers were, how they used our work, what they needed from us, and how we could serve them better. I was asked to review her work and suggest improvements. After multiple failed drafts convinced me that the office director was not likely to be able to develop a satisfactory plan on her own, I suggested bringing in a consultant to help us develop a comprehensive list of our major customers and a plan for how to meet their needs more effectively. I made clear to the consultant what we needed – a reasonably complete (and prioritized) list of customers, an identification of whom we were serving well and whom we were serving badly, and recommendations on how we could improve our service to our most important customers. The consultant gave us what we asked for and put us in a good position to make our outreach more effective.

When I was appointed, on an acting basis, to serve as Associate Director for Information Systems at BTS, the office had been without an associate director for over a year. The five office directors had become accustomed to operating without any real supervision, and essentially setting their own direction. BTS was facing reauthorization, and demonstrating our customer focus and accountability was essential. I immediately met with each office director to review their plans and assess their problems. One office was in good shape, with firm leadership attuned to the agency's goals. Two others were floundering, with good staff but no clear plan and no assessment of priorities. A fourth was struggling with a massive Information Technology (IT) project that was far behind schedule and over budget. The fifth was confidently cruising along, but was not really meeting its customers' needs.

I largely let the first office go, relying on periodic brief reports, while I focused on the others. I worked intensively with the second and third offices to develop program plans that set priorities for their staffs' work. I worked with our External Affairs staff to identify what our customers' needs were for the work of these offices, and worked with the office managers to develop program plans that focused on these customer needs and the Department's mission and goals. With the fourth office I encouraged a more entrepreneurial approach to solving their technical problem, developing a detailed project plan to achieve a reasonable degree of certainty on when their major IT project would be completed and what it would cost. I brainstormed with the fifth office and with our External Affairs staff to develop a better concept of what its customers' needs were and how the office could meet them.

The results were a much clearer prioritization of effort at the two offices that had been floundering, so the staff felt accountable for delivering on a well-defined program of activities and so their customers felt that their needs were being better met. The fourth office solved the problems that had delayed their major IT project so that their technical expertise became credible again. The fifth office developed a more entrepreneurial spirit with new products that better met its customers' needs. And the first office continued to produce great work.

When I arrived at FRA, we were nearing the completion of a 10-year period in which we had substantially revised our safety standards for track and braking systems. These

efforts had been effective in reducing the number of collisions and derailments. As one category of accidents declined in severity, however, it became apparent that other categories were becoming relatively more significant. Low-speed accidents in railroad yards began to account for a larger share of railroad fatalities. Unfortunately, we knew little about the etiology of these accidents. So we launched a cooperative effort involving FRA staff, rail employees, and rail safety managers to find out what was causing yard accidents. The yard accident study resulted in a series of recommendations for railroads that we highlighted in a special meeting of our railroad safety advisory committee. We established yard safety committees at each railroad to follow up to ensure that the recommendations would be implemented. The following year, yard fatalities dropped 38 percent, and dropped a further 25 percent the year after.

When I arrived at the Investigations and Oversight Subcommittee, there were no standards applying to the work of the staff, no performance appraisal system, and no accountability. Staff had largely set their own agendas and their own standards. I quickly formulated a set of standards that staff would have to meet – preparation for hearings would be thoroughly researched, would identify clear issues for action, and would be summarized clearly to allow Members to understand the key issues. Reports would have to be well-researched, well-organized, and well-written. Hearings would follow a clear sequence of thorough preparation, effective targeting of the issues, and systematic follow-up. While much of our agenda was set for us by the Members, I encouraged entrepreneurship by staff to identify issues that had not yet been picked up by the public policy radar – one such investigation was the status of GPS-based navigation systems. I developed a year-long program plan listing all of our hearings, why we were holding them, and what we expected to get out of them. We tracked our progress in following up on all our investigations, and succeeded in making substantial progress on many of them, either through changes in administration positions or in legislative action.

4. Business Acumen: BTS' budget has been fixed at a constant level for 7 years. At first the level was high enough to accommodate growth, but toward the end of the 7-year period, the growth in our mandates had exhausted the slack in our budget, and the need for cuts had become painfully evident. As part of the BTS Executive Team, I played a leading role in a zero-based budgeting effort to prioritize our programs. Every project that was underway or planned was ranked (many projects were divided into slices with different priority levels) and displayed on a spreadsheet. Office managers were brought in to discuss each project and answer questions about how well it responded to customer needs. Cost estimates were discussed and refined. When we developed the budget, we didn't know what budget level we would have available for the budget year just beginning because the Congress was late in reauthorizing and appropriating funds for the agency. The Team exhaustively adjusted priorities until we had a consensus ranking that we could use to decide which projects would be funded and which would not, regardless of what budget the Congress gave us. The zero-based budget allowed us to meet our budgetary constraints, achieve our most important goals, and make the staff feel more comfortable with the result because they had had an opportunity to participate in the process.

When I became Acting Associate Director for Information Systems at BTS, it was immediately clear that there was a lack of management information systems in place. There were no project plans, no schedules for completion of projects, and no regular reporting of progress in completing work. I immediately instituted a monthly reporting process on all projects, and required office managers to establish milestones for each of their projects. One particular issue that was creating unhappiness was procurement of desktop computers. Our more technically sophisticated computer users were complaining that their equipment was obsolete, but we couldn't afford to accelerate our agency-wide procurement of desktop equipment. I came up with a dual "refresh cycle" – a more rapid rate for "power users" with high-powered computing needs, and a lower rate for less sophisticated users who primarily used their machines for word-processing and relatively simple analytical work.

When I arrived at FRA, its safety inspector workforce was aging, with many employees nearing retirement age. The railroad labor force, which had been our traditional source of recruits, was shrinking, and government jobs were becoming less attractive relative to private sector jobs. It was clear that we would have difficulty replacing our safety staff when they all began to retire in a few years. I directed our human resources staff to restart a program that had become moribund to provide training opportunities to people who had no experience in the railroad industry. The program primarily recruited FRA administrative staff who wanted to move up into higher-paying technical jobs, but who lacked the technical skills to compete for those positions. They were run through a three-to-four-year apprenticeship and mentoring program to learn the technical skills they would need to perform as safety inspectors. Most of the recruits are women, and many are minorities. The results will take years to appear, but will provide a more diverse workforce that can bring to bear a wider range of skills in addressing rail safety problems.

5. Building Coalitions/Communications: Communications has been central to my work my entire career. From my early years as a teacher, when I had to communicate to my students an unfamiliar way of thinking, to my years at GAO, when I found ways to explain technical concepts in ways that Members of Congress and their staffs could understand, to my years on Capitol Hill, when I worked with staffs of other Members to build coalitions to enact legislation, to my work at the Department of Transportation, where I had to work with staff from other agencies to build consensus around policy proposals and joint projects, I have always found ways to communicate technical concepts in ways that non-technical staff could understand, persuade them that my conclusions were correct, and identify the needs and concerns of different staffs so as to build coalitions in support of consensus positions.

BTS is a statistical agency, and as such it requires a certain degree of independence from the political process. If its data are perceived to be subject to political manipulation, they will be of limited value for policymaking. DOT had never explicitly recognized BTS' need for independence in the release of data and analysis. When I came to BTS, its independence was being undermined by prolonged review of its work in the Office of the Secretary of Transportation (OST). I drafted a clearance procedure for BTS that protected BTS' independence while accommodating OST's reasonable needs for advance

notice of data and analysis releases, and persuaded OST officials to accept this restriction on their authority as being in the best interests of transportation policymaking.

At BTS I discovered that our relations with other statistical agencies such as Census and the Bureau of Economic Analysis had become frayed. I instituted regular meetings with staff from those agencies to rebuild trust and build a more cooperative relationship. I've drawn upon my relationships with key staff developed in professional associations to gain their support for providing us with critical assistance to allow us to achieve BTS objectives.

When I arrived at FRA, I discovered that our proposed rulemaking on grade-crossing safety was in deep trouble, arousing serious hostility in a powerful state congressional delegation. I changed the communications approach to our rulemaking, emphasizing the inherent flexibility in the proposed rule, meeting with constituency groups and members of Congress, and developed a pilot grant program to demonstrate that compliance would be easier than most people in the affected community thought. A key test was my testimony before the House authorizing committee in which several members of the state delegation, including the Speaker of the House, testified against our proposal. My testimony helped to win over a key member of the state delegation who sat on the committee, and subsequent personal discussions with a key senator brought him on board. The result was that congressional hostility weakened and we were able to issue the final rule.

Building coalitions was particularly central to my work on Capitol Hill, where, as a staff member to the minority party, it was essential to work with members of the opposite party to build majority coalitions. In several cases I was able to win majority support, both in Committee markups and on floor votes, for amendments that the minority side favored (for example, on labor issues relating to Amtrak) by talking with members' staff and persuading them that our amendments improved the legislation. On one important initiative to promote the reconstruction of short line railroads, I had to work hard with lobbyists for labor and for short line railroads to keep their mutual hostility from killing the legislation, and with representatives of the majority party's leadership to reconcile the seemingly irreconcilable conflicts between them and labor. I eventually succeeded and the legislation was enacted.

At GAO it was necessary to work with staff from a variety of divisions and disciplinary backgrounds to complete our projects. As a member of the Chief Economist's staff, I worked with policy analysts from various divisions of the agency to persuade them to incorporate good economic analysis in their reports. In working on my own research projects, it was usually necessary to work with staff from other disciplinary backgrounds – lawyers, actuaries, survey research specialists, and accountants – to develop our conclusions. In all of these cases, I was able to communicate to them the importance of the economic concepts I brought to bear upon the analysis, and to make them realize that I understood the value of the unique perspectives that they contributed.

**B. Technical Requirements**

1.  Understanding of the Impact of Transportation on the Economy:  Analyzing the
impact of transportation on the economy has been central to my work for the past two
decades.  In my graduate work and teaching, I became thoroughly familiar with a wide
range of theoretical and practical economic analysis, including welfare economics,
macro- and micro-economic theory, industrial organization theory, antitrust and
regulatory economics, cost-benefit analysis, cost-effectiveness analysis, and input-output
economics,  and with the application of this knowledge to investment decisions,
regulatory interventions, sources of economic growth, and determinants of technological
change and productivity improvements.

At GAO, I applied this knowledge to the review of transportation-related public policy
proposals (including deregulation, reregulation, antitrust enforcement, safety
enforcement, and infrastructure investment) and examined their impacts on the economy.
I prepared a series of reports (listed in my resume) examining the competitive structure of
transportation industries, the economic effects of international aviation liability
limitations, the economic costs of maritime cabotage restrictions, the cost-effectiveness
of various highway construction technologies, and the financial viability of airport and
high-speed passenger rail developments.  On Capitol Hill I reviewed the economic
implications of proposed railroad mergers and assessed their competitive impacts and
reviewed the costs and benefits of proposed rail safety regulations.  At FRA I guided the
preparation of Departmental comments on proposed railroad competition policies issued
by the Surface Transportation Board and reviewed the adequacy of cost-benefit analyses
of proposed safety regulations.

At BTS, I have led the creation of our transportation economics program, incorporating a
series of research projects on the economic impact of transportation, including analysis of
how fluctuations in the level of transportation services affect the macroeconomy, how
transportation affects global competitiveness, the relationship between transportation
infrastructure investment and job creation, and the effect of increased productivity in
transportation on economic growth.  I have also edited the *Journal of Transportation and
Statistics*, and have reviewed all the articles published in the journal to ensure that they
use appropriate economic analysis and statistical techniques in analyzing the economic
impacts of transportation policies.

2.  Developing Innovative Approaches to Promoting Economic Growth through
Transportation:  As the availability of funding for transportation infrastructure investment
has failed to keep up with infrastructure investment needs, a wider range of policy



options have come under consideration to bridge this gap, including public-private partnerships, congestion pricing, and innovative finance. I have been actively involved in all of these areas.

At GAO I led a project to identify more cost-effective highway construction technologies by using life-cycle costing. On Capitol Hill I worked with short line and regional railroads to develop the concept of using federal loan guarantees to leverage private sector investment in short line railroad development, secured support for its legislative enactment, and, when I was at FRA, worked with OMB to translate it into a working program. At FRA I also served on the Board for the Transportation Infrastructure Finance and Innovation Act (TIFIA) program, which was designed to use federal funds to leverage private sector investments in transportation infrastructure projects. I worked with other modal administrations to review proposed projects to ensure that they were effective in leveraging private sector investments and that they created significant economic impacts.

I was also active, both on Capitol Hill and at FRA, in reviewing a wide range of proposals for reforming Amtrak, including proposals to separate ownership of right-of-way from operation of trains and proposals to shift funding responsibility from the federal government to the states. I drafted the Minority Report to the Committee on Transportation and Infrastructure's Blue Ribbon Commission on the Future of Amtrak. I also served on the Amtrak Reform Council and prepared an analysis of its proposed recommendations for the other members of the Council.



3.  Understanding the Interrelationship between the Public and Private Transportation Sectors:  Transportation is, as Chief Justice Waite concluded, "affected with a public interest." It almost always involves a combination of public and private roles. Either it involves private carriers operating on publicly owned rights-of-way (as with highways, inland waterways, and airlines), or it involves private carriers being regulated by public authorities for safety or industry performance reasons. The analysis of the appropriateness of these public roles – how much infrastructure to build, what technology to use, where to build it, how to regulate operations over it, what safety rules to adopt, and what regulations are needed to promote competition – has occupied most of my professional life. I have also spent several years analyzing the peculiar economics of the railroad labor market, a bilateral monopoly where failure to reach agreement on contract terms is so devastating to the health of the economy that the Congress has rarely allowed work stoppages to continue for more than a few days.

The long series of GAO reports on transportation that I authored or directed all addressed, in various ways, the impact of public policy on the transportation sector – its carriers, its customers, and its employees. On Capitol Hill, I prepared policy briefing documents for Members of Congress, including Committee and Subcommittee chairs and ranking members, on the effects of legislation – which generally involved changes in the public policy environment within which private sector carriers operated – on carriers, shippers, passengers, and employees. At FRA I reviewed and critiqued staff cost-benefit analyses of the impacts of proposed Administration policy changes (particularly safety

regulations) on private parties in the transportation industry and brought to bear my extensive experience in these areas to ensure that the analyses employed sound economics. Both on Capitol Hill and at FRA I reviewed railroad merger applications and proposed changes in Surface Transportation Board competition policies to assess their impact on shippers, railroads, and other private parties. At BTS, I have been editor of the *Journal of Transportation and Statistics*, and have reviewed all the articles published in the journal to ensure that they use appropriate economic analysis and statistical techniques in analyzing the private effects of public policies.